Welcome to the last day of our panel sitting here in Atlanta. Judge Legault and I are very happy and very privileged to have with us Judge Virginia Covington from the Middle District of Florida. She sits in Tampa. She sat with us a number of times before and yet has come back for more punishment. So we're very glad that she's here and thank her for her able assistance. We've had a long week and we're finishing up, thankfully, with easy cases. So it's a good way to go out. I think with all of your assistance, I think we figured out the order of the attorneys. If I make a mistake, just stand up and correct me and we'll try to make this go as smoothly as possible. As I told the attorneys, we may take a break, a five-minute break between blocks two and three, but we'll see how everything goes. If you are familiar with our lighting system, when the yellow light goes on, that means that your time is drawing to a close, so begin to wrap up. If we take you beyond the red light, just keep on going. You'll be on our time and not yours. And with that, we're ready to begin. You should assume, I think, that we have read a lot, but we have not read everything. I didn't have to wear glasses before. So we have not, I think it is probably safe to assume for the three of us, done the deep dive into the granular aspects of the case. We certainly have read all of the district court's orders. We've read all of your briefs. We've read some of the underlying materials, like some of the expert reports, et cetera, on the Daubert issues, but we have not done a 100% dive into all of the issues. So when you present your argument, if you're going to rely on something that is on the granular level, please let us know where we can find it so that we can turn to it when we do that deep look after the arguments are over. Okay, with that, we are ready to begin. This is the Zantac, I still can't pronounce it, Rinitidine product liability litigation. There are too many consolidated cases to mention, so we will just begin with Mr. Keller. Fire away. Good morning, your honors, and may it please the court. Ashley Keller on behalf of the plaintiffs. We obviously have a lot to cover in this segment, so let me give you a proposed roadmap of where I want to take our conversation. I'm going to start with subject matter jurisdiction first and then turn briefly to the due process and personal jurisdiction issues, and then I'm going to spend more time on Daubert and Rule 702. I'm obviously offering this as a provisional plan. You can take me anywhere that you would like. But turning to subject matter jurisdiction first, I hope you'll allow me to steal a page from your playbook and cardi and cite the ancient wisdom of the Princess Bride. Just as a case cannot be mostly dead because death is an all-or-nothing proposition, cases cannot be mostly merged. They are either merged or they are not. And the Supreme Court hopefully has instructed us how to figure out whether cases are merged in an MDL that uses master pleadings. It tells you to use the refrigerant factors. And here, at the defendant's urging, the district court found that every one of the refrigerant factors was satisfied. And then it proceeded throughout years of the MDL, treating the cases as merged, confirming the wisdom of the district court's decision to say that the refrigerant factors were satisfied. That is merger, and that has jurisdictional consequences. Why are the cases merged for diversity purposes and subject matter jurisdiction purposes if the individual plaintiffs have to file their own complaints in addition to the master complaints? So even if they have to file their own pleadings, which is always the case with merger, you have individual actions with individual pleadings, and then they are combined into the same action. The test is functional under refrigerant, and there's a reason for that. There is a substantive difference between merger and mere consolidation that the Supreme Court has articulated. At a high level, consolidation lets a district court achieve efficiencies in an MDL through docket management process, through procedures. But you cannot derogate substantive rights. Can I ask you a question, Mr. Keller? Of course. My understanding is that the way this proceeded, the district court judge, she actually reviewed the master complaint, the amended master complaint, when she looked at the allegations and ruled on the pleadings and not the individual complaints. That is completely correct. And under Bell from the Seventh Circuit interpreting refrigerant, that's the most important factor to determine whether or not there's merger. When the district court evaluated Rule 12 motion practice, it only looked at the master complaint. And for purposes of the answer, the defendants, when they answered, they were instructed to answer the master complaint and not the individual complaint. I mean, I think there may have been like a few that were ordered to answer individual life complaints, but I think that was minimal. For almost everyone, they only answered the master pleadings. And again, that establishes that the master pleadings were operative pleadings. And again, I want to address an elephant in the room. My friends on the other side say, I've done a complete about-face. I had a different position. I was arguing that there wasn't merger. And that's true. I did stand at a podium in Miami in front of two of you and say, don't treat the master complaint as operative. Treat it only as a reference document. But it's a little rich coming from them to say that I've done an about-face. They urged to the district court that the cases were merged. They said every Bell and refrigerant factor was satisfied. Your colleague Judge Luck spoke to Mr. Lefkowitz and pinned him down and said, are these cases merged or merely consolidated? And he said they're merged. The Bell and refrigerant factors are satisfied. I lost, and they won. So I've got a good reason for changing my view. You didn't lose. The issue wasn't addressed. I didn't lose in front of your honors. You didn't address it. But the district court addressed it and said that the Bell and refrigerant factors were satisfied. And again, that has substantive consequences as the Supreme Court has laid out. Tell me how an MDL can proceed, in your view, without merger. An MDL can absolutely proceed without merger. It happens all the time. So you can use case management orders and docket entry inherent authority to say, we're going to sequence these cases. I'm going to have Bellwether motions to dismiss for these particular plaintiffs. That's happening right now in Judge Rogers' courtroom in the Depra-Provera MDL. And yes, this is going to provide substantive guidance to all of the other individual plaintiffs. But you don't lose your due process rights. You don't lose your individuality. If you have some different arguments that you think you can make as to why my motion to dismiss decisions are wrong, you can make them. MDLs do that with regularity. They issue orders saying, here's the sequence for discovery and here's when experts have to be disclosed. You have a choice, individual plaintiffs. Do you want to ride with MDL leadership's experts or do you want to submit your own? I'm not going to let you come back later and do it again. But if you choose to individually submit your own experts, as Home Depot said from your colleagues in the Third Circuit, you have an absolute right to do so. Ninety-nine percent of plaintiffs, I think, would elect to go with MDL leadership's choices, but they don't lose their individual due process right to pursue their own claims if they so choose. Here the district court mashed everything together. And by the way, I understand the instinct behind doing it. MDLs are large and complex, and this one in particular was very large and very complex. Tens of thousands of plaintiffs, dozens of defendants, lots of science. I understand why a district court judge would want to say, I only want to do things once and then I'll hand it to the 11th Circuit wrapped up in a bow. But you're not allowed to succumb to that instinct to try and improve efficiency at the price of derogating substantive rights. In your view, is the requirement of a master complaint unnecessary? Or a sufficient basis for finding merger? A master complaint by itself is not a necessary or a sufficient basis for finding merger. Merger can happen functionally in a lot of different ways. If you do choose to use a master complaint in an MDL context, it needs to just be an administrative document that individual plaintiffs as the masters of their own suits can choose to incorporate. If you force it upon them and say this is actually an operative pleading, they are now parties to that pleading. That pleading creates an action, and that action now lacks subject matter jurisdiction in this case. The plaintiffs are from virtually every state in the country. The defendants are from a dozen states. Of course there's no complete diversity anymore once there's merger under Strawbridge v. Curtis. What did the district court tell the tens of thousands of plaintiffs when it ordered the master complaints? The district court's case management order, I think you can find this at case management order 31, said you have to adopt this pleading. And as Judge Lagoa pointed out three years ago in Cardi, it said this supersedes all prior pleadings. So this is now going to be your pleading. You had the right as an individual plaintiff to put personal identifying information on your short-form complaint. You had the right to add allegations, but you didn't have the right to repudiate allegations from the master complaint. You didn't have a right to say I don't like the way MDL leadership drafted this. I want to go in a completely different direction, which of course you would have had a right to do if these actions remained individual. Let's look at what happened after the district court found that these cases met every one of the bell and refrigerant factors. We have the order to show cause process. After the district court issued its Daubert decision, thousands of plaintiffs filed their claims after that. So they weren't even parties in any court. They weren't in the district court. They weren't in state court. They were sitting on the sidelines. They came into court. And before they even walked into the batter's box, let alone got to first base, they were hit with an order to show cause saying, explain to me why law of the case doesn't apply. Explain to me why I haven't already decided the theoretical potential for rinitidine to cause cancer. Explain to me why estoppel doesn't apply. Explain to me why. But the order to show cause that was agreed to by plaintiff's leadership in terms of that's the procedure that you guys chose to elect. I very respectfully disagree. We did of course agree that an order to show cause should issue. We did not agree with the district court's list of five questions saying explain why law of the case didn't apply. I understand you can agree to the questions, but you agreed to the mechanism. Of course. An order to show cause is a completely appropriate mechanism to say, for example, to a new plaintiff, tell me why my motion to dismiss decision applied to other plaintiffs shouldn't apply to you. And then that plaintiff has an individual right to say, here's why it doesn't apply to me. When we're dealing with rule 12B6, it of course makes sense to say I've already ruled on something as a matter of law. And the law doesn't really change based on the individual record of a particular plaintiff. When we're talking about Daubert, of course that doesn't apply. Daubert is supposed to be under rule 702D. These particular experts did or did not reliably apply their methods or principles. A new plaintiff showing up in court who wasn't a party when the district court adjudicated that, of course gets to say, I'm going to submit a new expert. You can't apply law of the case to that new expert. You don't even know who the new expert is. And when you're at the complaint phase, there's been no 26S conference. There were no orders in the district court docket saying, here's when you need to disclose new experts if you're a new plaintiff. The district court just said, I've already done this once before. I don't want to do it again. I understand, again, the efficiency reasons why a district court might wish to pursue that, but that is derogating the substantive rights of individual plaintiffs. I don't see how you can escape the conclusion that the district court treated these cases as merged. And so, again, if that's true, there's obviously no subject matter jurisdiction, but I want to hit two of the points that my friends on the other side raise in rebuttal. I respectfully would refer to these as Hail Marys, but they make the argument. So I want you to take care for me on that. The first point they made, which is a reprisal of something they said in Cardi is, well, they were just merged temporarily. That's obviously not an answer under Lujan versus Defenders of Wildlife. A federal court must have jurisdiction at each phase of the proceedings. You can't point to what tomorrow promises to say that there's jurisdiction today. If I came into federal court with a pure state claim with no diversity, and I said, your honors, don't worry. I plan to amend and add a federal question in a year. You would laugh me out of court. And if the district court did somehow decide to reach the merits of that case, you would have no trouble summarily vacating that judgment for one of jurisdiction. So the temporary merger point doesn't really get them anywhere. So I really don't understand how they can argue that if the cases were merged, if you agree with me on that point, that there was actually subject matter jurisdiction. The other argument that they make to you under Ingram and Newman Green is, well, don't worry. You can just say no harm, no foul. As appellate judges, unmerge the cases. That is not what your precedent says. Your precedent, citing the Supreme Court in Newman Green, says sparingly in rare occasions where it wouldn't prejudice the parties, you may drop dispensable parties that destroy diversity. They don't want you to drop anybody. Dropping parties means the judgment as to those parties is vacated. They, of course, like the judgments on the merits against these parties. So they don't want you to vacate anything. And they don't have a practical way for you to go about dropping any parties. Who gets dropped? The plaintiffs are thousands of individuals from every state in the country. They're from more than a dozen states. They have no plan of action for how you would drop parties. What they really want you to do is just say, turn a blind eye to the jurisdictional defect in the way the MDL chose to be conducted. Respectfully, you're not allowed to do that. You're running out of time. So if you want to reach any of the other issues, you better pivot. I'm going. I'm going to very quickly tell you on personal jurisdiction, we're standing on our briefs on Ford Motor. We think the district court respectfully got it wrong. I just want to point out, knowing how big this docket is, you do have to address personal jurisdiction. If you don't agree with me on subject matter jurisdiction, SINOCHEM makes that a threshold issue. You have a choice of threshold issues that you want to address, but you can't go to the merits before you address jurisdictional issues. So for California and Massachusetts, at least, if you don't agree with me on subject matter jurisdiction, you have to get to personal jurisdiction. Let me turn to Daubert and rule 702. Again, I want to zoom out before getting into more granular detail. The order to show cause process, I think, was revealing because in more than one place, the district court said, the entire Daubert process, all of the science, all of the things that I considered were about the theoretical potential for ranitidine to cause cancer. Respectfully, that is revealing of the wrong inquiry for a gatekeeper under rule 702D. Obviously, that's the ultimate question, whether ranitidine can cause cancer. The focus is supposed to be on the reliability of methods and principles, and district court judges are supposed to act as a gatekeeper. In fact, under rule 702D, they have to act as a gatekeeper, but they're not allowed under Daubert, and many cases construing it, including from this court, to put on their white lab coats and act as an amateur scientist. I'm not sure that, again, this is based on a preliminary overview of the Daubert order and your briefs, not the underlying materials, but I think your argument is stronger with regards to some experts, weaker as to some. For example, I'm not sure that the district court, to use your words, put on the white lab coat with regards to Dr. Najafi. We don't challenge. I know. I'm just saying that I don't think you can make an across-the-board statement about the district court basically playing the role of fact finder because with Dr. Najafi, and I know it's not an issue, but there were a lot of procedural issues that the district court identified with him, which led it to exclude his opinions and report. I agree. I'm just saying I don't think it's an across-the-board yes or no for you or for the defendants on the Daubert issues. That's my initial read of the record. I appreciate that, Your Honor, and I agree. The district court is stronger in some areas and not in others, and we made a decision not to appeal the Najafi exclusion, even though we thought his testimony should have been admissible. We recognize it's an abuse of discretion standard, and we recognize that there are some things that are within the district court's clear gatekeeping function where it's a tough standard to overcome. The point that I would make, which is overarching, is I think we need to do a better job, and this is not just in the 11th Circuit, it's writ large since Daubert, of policing the line between gatekeeper and putting on the white lab coat, which are not my words. I stole that from Chief Justice Rehnquist from the Daubert opinion. But putting on the white lab coat is obviously impermissible, and that's never within a district court's discretion. The problem is that there's been too much ink spilled, and you can find, you, we can find cases applying Daubert narrowly as a very narrow gatekeeping function, and you can find cases, this is my view of the case law, I'm not ascribing it to my colleagues, that gives the court a much broader role and much more leeway to get into things that we might say are substantive in terms of opinion. So that's the problem. And that divergence in case law exists even within this circuit. You can find very narrow opinions on Daubert, and you can find others that are much broader. So it's a difficult, it's a difficult terrain to navigate. I couldn't agree with you more. I won't put words in your colleague's mouth, but I agree with you. That is a fair reading of the case law from this circuit and other circuits. And I would encourage you to provide better guidance to litigants and district courts, because it's too easy now to jump between the cases and not have a clear sense of what that line is. And the line between gatekeeper, which is appropriate and ultimate fact finder or amateur scientist, that is a question of law. That's not a question of discretion. So let me offer a simple rule of thumb that I would propose and commend to your honors. Ask the question for any issue that the district court is considering. It doesn't matter. Is this something that an intelligent, well-educated conscientious person who is not a scientist could answer? If the answer is yes, it's a pretty good guide that that's within the district court gatekeeping function. If the answer is no, if you would have to be a scientist as you clearly would to ascribe a statistical significance, absolute importance, for example, which comes up in the Daubert order, that's clearly on the other side of the line. I see that my time is up. May I ask a question? Sure. Okay. Mr. Keller, I had a question regarding McLean analysis. If the district court applied the incorrect level of generality to the McLean analysis, do you have sufficient evidence regarding the NMDA to satisfy the Daubert review under either category one or two? We absolutely have sufficient evidence, Judge Lagoa. So on the claim category one, they didn't even move to exclude our expert Dr. Zeger who testified that for five decades, the scientific community has accepted that NDMA is a probable human carcinogen. IARC says that the health and human services department says that ATSDR, which is a division of the centers for disease control says that their own scientists say that the inventor of the molecule GlaxoSmithKline said that to their own employees when the FDA issued the recall. So we have ample evidence to show that NDMA is a probable human carcinogen. All right. Thank you. You've saved your, your time for a little on this. Thank you, Mr. Keller. Thank you. Mr. Petrosianelli. May it please the court, Joe Petrosianelli here for the brand defendants on the personal injury appeals. Thank you, your honors. Let me start with subject matter of jurisdiction. Your honors decision in Carty necessarily decided this question because the court found in Carty that the operative Mr. Carty's operative complaint was the master personal injury complaint together with his short form complaint, which by the way, is what everyone said below judge Rosenberg said it. We all said it that the, the, the combination of those two. And that means you held that Mr. Carty could not appeal. There was no appellate jurisdiction because there was no final judgment in his short form complaint. And every other plaintiff had the same thing. A short form complaint with the master complaint. That doesn't necessarily mean there isn't merger. Well, no, I, two things about that. One is you'll remember in after the Carty oral argument, your honors asked for supplemental submissions on this question because the court agreed, well, if there's merger, there's no diversity jurisdiction. And there was supplemental briefing on that. But the, in Carty, the question or the, the decision was because there wasn't a short form complaint required of Mr. Carty and every other plaintiff, each of the cases had their own needed. I think, and I'm, I'm speaking only for myself. I'm not speaking for judge Jordan, who was on the panel as well. I think I, at the time, my understanding was that the short complaints that the master complaint was in essence, an administrative summary. And I'm not sure that's actually how the district court ended up proceeding in the case. Your honor, here's the master complaint, which as judge Jordan just pointed out is used in almost every large personal injury MDL. The master complaint was every, and everyone agreed was a case management device for judge Rosenberg to address cross-cutting legal issues like Daubert, just as one example. But the defendants, my understanding is that defendants were ordered by the district court judge to answer the master complaint and not the individualized short complaint. That is true. Although as you pointed out, judge Lagoa, there were some individual short form complaints that were, there was a specific order add to those. Correct. But what is really telling is what happened after you decided Carty, what happened on remand judge Rosenberg, right after you decided Carty, she had entered the Daubert order. And then the question was, how is this Daubert order? What do we have to do now in the case? And two things were decided. One is we have to figure out which plaintiffs does it apply to. We have to look at all the short form complaints because they're all individual actions. As a simple example, many plaintiffs alleged what we called non-designated cancers, cancers that weren't the subject of the Daubert order. The Daubert order was not going to apply to them. And so there was a process that she put in place with both sides agreement that that order on Daubert doesn't do anything. We now have to figure out which plaintiffs it applies to. And she said, and this is in her order that is in, this was in February of 2023 after the court decision, she has a footnote where she says, my understanding of the 11 circuits ruling in Carty and the fact that these cases are separate. And now I have to go to each short form complaint to figure out whether the Daubert order applies to it or not. That was my understanding all along. In other words, we all agreed that these cases were separate cases and we were using the master personal injury complaint to decide cross-cutting issues that could apply, not necessarily did apply. They say they say that it, that the use of the master complaint did more in the sense that the plaintiffs were not allowed to opt out of them. They could supplement them with their own short form complaints. They couldn't opt out. They couldn't say, I don't like, you know, class counsel's master complaint. I'm going to frame my own and I'm going to file my own. They weren't allowed to do that. They weren't allowed to do that, but it's not true that they weren't allowed to quote unquote opt out. For example, in the master complaint, there's a number of causes of action pleaded. They didn't have to plead all those causes of action. There was, they, in fact, most of them did not. They chose what causes of action to plead. You could have pled them differently. There was a box. They, they were then allowed. There was a checklist that allowed them to decide which causes of action they wanted to plead. And then at the end, it said if you want to plead different causes of action under different state laws, under different theories. No, but for the same theory, you were stuck for that. If you had a claim for X, there's so many claims here. I'm not even going to try to pin one down, but if you had a claim for X in the master complaint and one of the individual plaintiffs said that claim is completely messed up, it's just so badly pled. I've got to replete this claim. So I do want to plead a claim under X, but I don't want to ride the master complaint. I want to file my own. They say that that wasn't permitted. And that was an indicator that there was merger. Tell me why they're wrong. Yeah. You couldn't file your own separate complaint. You had to use the short form complaint, but if you didn't like the way that things were pleaded or alleged, you could fill in in the, that sort of free text, if you will, you could fill in anything that you wanted. And which one governed if there was a conflict between the two pleadings? Well, I think if there had been a conflict. The conflict in my hypothetical, which is I want to plead claim X, but the master complaint does such a bad job. I think it's going to be knocked out of the 12 B six motion. I want to plead it differently. And you plead it differently in a little box. And so what does the district court use? Well, this is the point about why after the Daubert order came into play, we had to look at all the short form complaints. No, no. What's the answer to the question? No, I think if there was going to be a conflict, then you had to go to the master complaint. So you're locking the plaintiffs out in a sense. Because that's the, I mean, there has to be one operative pleading, right? We all agree on that, right? You can't have multiple operative pleading. There's one operative pleading, just like there's one operative pleading for as an answer. And so the district court judge, the question is the district court judge, when she's ruling on substantive motions, whether it's the motion for summary judgment or the motion to dismiss, what operative plain pleading is she looking at? And my understanding is she's looking at the master complaint and the master answer. Your Honor, I think she did it in two phases. That was my point about what happened after Daubert. She understood, she said many times the operative complaint, just like you said in Carte, is the master complaint together with the short form complaint. And so she ruled on Daubert as a general causation matter, right? General causation by definition is not plaintiff specific. She had to have some vehicle to rule on general causation. She ruled on general causation, but then said because the operative complaint, as Your Honor said, is two documents for each plaintiff, we now have to see whether any of the short form complaints can survive my ruling. And I'm going to issue an order to show cause, which is a perfectly, not only is it perfectly appropriate, it's what the plaintiffs asked for. And we all agreed that was the appropriate way to do this because it was a general causation ruling, not plaintiff specific. And then she said, any plaintiff who thinks that their short form complaint can survive my order, please explain it to me. And she says in that order, I understand this is expressly stated in the order to show cause. I understand people might want to, quote, relitigate the issue and ask for more discovery and have more experts. I understand that. I'm giving you a chance to do that. And the only reason she did that is because the decision, the general causation decision that was directed to the master complaint allegations had to then be applied to each individual case. And no one came forward. They were all locked into the master complaint. No, but as Mr. Keller just said, some plaintiffs could have said, well, wait a minute. A Daubert ruling is specific to those experts. I have my own experts. I just am kind of confused because I thought in docket entry 876, and I can't remember what that was titled, the district court order specifically said that all claims pleaded in the master complaint would, quote, supersede and replace all claims previously pled in the cases joined in the MDL proceeding and taken together each short form complaint and master personal injury complaint would constitute the operative complaint. Yes. And that is why this case, these issues are different than Mr. Keller cited, the refrigerant compressors case and the bell case. There's no short form complaints in those cases. Tell me the best reported case out there. Well, published or non-published case that says that something close to what was done here does not constitute a merger. They cited some cases which are factually distinguishable, but set forth general propositions about when merger occurs and set out factors. Are there any cases that are factually not identical, but similar here where the use of a master complaint in a short form was deemed not to constitute merger? Well, to Ms. Gelboim, the Supreme Court case says that the presumption is the cases maintain their separate identity unless and until the parties do something where they meant to consolidate them for all purposes. I know, but that case tells me nothing. It just tells me about a theoretical possibility. Right. It doesn't tell me what that possibility consists of. And then we cite in our... It's a starting point, but... We cite in our briefs a number of MDL cases. I don't know that there was specifically challenged to say, oh, that meant there was a merger and the court decided it. I mean, the problem, Your Honor, is that these master complaints are so commonly used in MDLs and no one in these products liability MDLs where there are these cross-cutting issues like Daubert and preemption. And I don't know of a single one where it was found to be that meant the cases are merged. I mean, there's not a single case out there in a products liability MDL context with short-form complaints, which is the way it's always done, with each of the individual plaintiffs that has ever suggested that destroyed diversity jurisdiction when the parties, both sides, and the court said, we understand. I mean, it was not a mystery that there were plaintiffs from every state and then defendants from many states and that if the cases had been merged for purposes of subject matter jurisdiction or for all purposes, that that would destroy diversity. This was not an issue that escaped people's attention. Well, it's just it's a little strange to say that you have to answer the master complaint but not answer the short-form complaints. So it suggests like almost the short-form complaints are like the supplemental filing, but they're not really an operative pleading because, I mean, if it's an operative pleading, you would have to respond to it. We would have had a response to it if, for example, the judge, let's say she denied our Daubert motions or let's say she found that a plaintiff came forward and said I can come up with my own experts. Then the whole way MDLs work with this sort of master complaint, short-form complaint process is then if cases then proceed past the motion stage, whether it's a Daubert motion or a preemption motion, the court picks bellwether cases and then you answer the short-form complaint. But it almost seems like normally if you want to just talk about the master complaint being sort of an administrative summary, it appears here that the master complaint has been the operative complaint,  and the short-form complaint really is almost the administrative summary. It's sort of in the reverse. I mean, I'm not only speaking for myself, but, I mean, to me the issue is how did the parties in the district court proceed and what did they treat as the operative pleading? And depending on what was the operative pleading, then there could be potentially a merger depending on the bell factors if you look at the bell factors. Right, and everyone proceeded. Everyone said repeatedly, we understand two things, that the operative complaint is the master complaint and the short-form complaint, that everyone said that. And we all agree and understand that by using the master complaint as the vehicle to litigate these common issues, no one is claiming that it destroyed diversity. No one thinks that. It wasn't intended to be that way. It was intended as a vehicle to address these common issues. Everyone proceeded under that understanding. Mr. Keller says that the district court in one of its many orders sort of acknowledged that the refrigerant factors were sort of met and that as a result, that's an indicator again that there was merger for subject matter jurisdiction purposes. Could you address that? Yes, in the same opinion, the district court in one of its many orders said that diversity jurisdiction came up and she said, we all agree this does not destroy diversity jurisdiction because my understanding, this is the district court's order, my understanding is that we're using the master complaint to litigate this cross-cutting issues and then I'm going to have to figure out how it applies to the individual short-form complaints. And so while my view is, again, the district court speaking, my view is that I can use the master complaint to litigate these cross-cutting issues. It doesn't have any impact on diversity jurisdiction because I'm not merging the cases together for those purposes. And by the way, remember, it's an MDL. Let's say we lost the doubt motion. She only has jurisdiction for pretrial proceedings. She has to remand the cases. If it's merged and it's one case, what's she going to remand? That's what really makes no sense because in the MDL context... If it's merged, it's going to be remanded back to the individual because it's going to be like a basic remand where it goes back to state court. But if it's merged, then it's only one case. So you have 10,000 plaintiffs, their theory is, there's 10,000 plaintiffs in one case. Where's she going to remand it to? She has to remand to their home districts. The only way, and that's why she said, of course these are still separate complaints. And so Judge Jordan, to address your question, in that order where she said, I'm thinking of this as a merger for just addressing these common issues. I'm not at all, and no one is thinking of this as a complete merger because that would destroy diversity jurisdiction. And the plaintiffs didn't say, no, no, no, that's the way we're thinking of it, and we surely didn't. Everyone had that understanding before your decision in CART-T. And then after your decision in CART-T, as I just read, Judge Rosenberg, in implementing the order to show cause, said the way that the 11th Circuit looked at the CART-T issue, that is to say that the short-form complaint was part of the operative pleading is the exact way that I think of it. And that means I am going to have to look at all these short-form complaints to figure out how to implement the orders. And so- Let's turn to Daubert. Yes. Ron, of course I start with the proposition that the standard of view here is abuse of discretion. Judge Rosenberg spent hours and hours in Daubert hearings and in briefing,  incredibly admirable discretion with respect to what was presented to her. Well, no one, I mean, I think, well, I think most people would agree that she put a lot of work into this and was very, very thorough. The question is, with respect to some of the experts, that she, was she a little too thorough in the sense that she crossed that difficult line, that unintelligible line between gatekeeper and decision maker about the actual issues being opined on by an expert. I think- And I, you know, I read the order. I read the order. It's 300 plus pages long. And my feeling, as I told Mr. Keller, is that with regards to some experts, it looks like normal run-of-the-mill, very extensive and very thorough, but run-of-the-mill Daubert analysis that I would pretty easily affirm   I'm not sure about all of them. I mean, some of the stuff that she criticized, this is global. Some of the things that she criticized for some of the experts seem to be like fodder for cross-examination about why they weighed one study more than another study. I mean- I think, Your Honor, that is, respectfully, that's not what she did in the sense that she was laser-focused on methodology. In other words, she wasn't weighing one- she herself wasn't weighing one study against another. And she wasn't saying, you know, I disagree with the way these experts weighed this study and that study. She was looking at how they did it. She was- I know, but again, this is only my sense from an initial review. So I don't want to even tie my own hands and my questions to any of you. But it's almost like you don't have any questions left for an expert because everywhere that you may have a question for an expert and you may be able to damage him or her on cross-examination because of some perceived flaw or error or miscalculation in the report leads to exclusion. And I'm just telling you that's the general sense I got with regards to some of the experts. That may not be a correct sense once we read everything underneath the order, which are the reports and the depositions and the like. But that's my initial feeling. I would say you're on two things. First of all, of course, every Daubert point is a good cross-examination point. In other words, that would- every time the court has excluded or affirmed exclusions under Daubert, the points, if the motion had been denied, would be cross-examination points. The question is, are they also reliability points? And I would suggest to the court, when you're looking at the record- I guess what I would say is- I think you're right. But I guess what I would say is not every reliability deficiency leads to exclusion. That's true. There are some that do and some that are close enough that you allow the jury to figure it out after a fulsome cross-examination. I think what I would suggest to the court is the key to Judge Rosenberg, why these reliability points were bases for exclusion under Rule 702 is there are a couple of things that she rooted in this court's precedence. So for example, the inconsistent application of methods and treatment of methods. I'll give you an example because I think you mentioned statistical significance. Judge Rosenberg said- did not say what the plaintiff said. She said that you always need statistical significance studies to find- to have a reliable causation opinion. She said the problem is when there was a non-statistically significant finding that was on the right side of one, in other words, a positive finding, then that was evidence of causation. But then if there was a negative one, if there's a non-statistically significant below one, that's nothing. That's a methodological problem. It's evidence as multiple courts have held, including this court, of cherry-picking inconsistent application and methodology. And then the experts in their professional work, right, the Kumho-Tyer factor, inside the  outside the  they- in their articles, they say statistical significance, that's what you need to say that there's no  So that's an example. It's not that Judge Rosenberg was saying there's some bright-line rule or I disagree with the experts, it's that they applied it inconsistently in a results-oriented way. The active comparator studies, they said, well, yeah, it's true that all the epidemiology shows no association between reninidine and these active comparators, in other words, people who are taking other acid suppressants, but that's no good because we think those acid suppressants cause cancer too. And then they were asked,  what's the support for that? We don't know. They just said that. And then they said, oh, that's great evidence of causation. It's those kinds of things where the experts were within their own opinions inconsistently applying their methods in a results-oriented way and in a way that they don't do outside the courtroom. And those are the kinds of things. This court has found many, many times, including most recently in the Deepwater Horizon case late last year, that if you rely on studies and then you draw conclusions from those studies that go beyond what the authors themselves said should be the conclusions, that is a major red flag. There are half a dozen cases from this circuit and many others, circuits that are affirming exclusions in their own  I don't know why that is a broad rule of application because an expert can rely on some other experts'  but to suggest that the expert at issue is bound by the other experts' reports and can't go beyond it to provide a different inferential opinion seems to me too broad a  It's not a positive issue. I'm just saying that there are a number of decisions that point that out as one factor. That's all Judge Rosenberg did. She said this is another factor. Not that it itself would justify exclusion. That's why her opinion is 300 pages long because there were a dozen or more reasons why methodologically these experts' opinions were not reliable, not sound, not grounded in scientific principles. I see my light is on. All right. Thank you very much. Okay, Mr. Keller. I think I'm seven minutes to be fair to the court. Thank you,  So, Judge Jordan, a docket entry, 4595. He's got seven minutes, Valerie. The district court doesn't sort of say it clearly says that the bell and refrigerant factors are satisfied. Again, that's docket entry, 4595. The reason the district court says there's not a subject matter jurisdiction problem is in three sentences it bought into their temporary merger argument. It said eventually I'll unmerge these cases but that's a Lujan versus defenders of wildlife problem. Why can't we take the use of the word merger as just shorthand for something else. It's not a magical incantation that constituted destroying diversity in   Of course, I agree with you. You can't just incant the words consolidation but if you merge them keep jurisdiction and if you accidentally use the word merger that's how you treat the cases of course there's no subject matter jurisdiction problem. I'm    the bottom line but we need to make that decision. 110%. That's what this all comes down to. Let me talk about Mr. Carty. His case proves that the parties treated the cases as merged. After you sent the case back down you noted the case was  The defendants agreed.  didn't oppose entry of   submitted a proposed order to give Mr.  finality. I don't care what either of you want. You're not going anywhere. Even though I dismissed your one claim as a matter of law, the Illinois Supreme Court won't recognize your claim. That would never happen if his case were individual. You don't dismiss someone on a 12B6 and say you still have to stay here and go through summary judgment. Whose claims were dismissed from the master court. They never answered his short form complaint. You don't make someone go to rule 56 and produce an expert if they don't submit an answer. There's no way to explain what happened to Mr. Cartey. That matters because if his case were individual and all of the claims he     he would   the right to come up here to have that reviewed. He was robbed of that right because the MDL wanted to treat everything together. That has jurisdictional consequences. I think you heard my friend say this happens all the time in MDLs. We should look the other way. No, we should not. Just because stuff happens a lot doesn't mean when we get the question for the first time we shouldn't consider it. This doesn't happen all the time. You don't usually have a  There are ways for judges to preside over complex MDLs like Judge Rogers is doing. We should     The district court chose to take the extra step of going all the way into the realm of  That is going to have jurisdictional consequences. Let me ask you a question moving on to a different topic. I want to make sure that I understand your position. Are you still conceding that if the ruling is affirmed,  summary judgment ruling must also be affirmed? I don't think I conceded that. There are different buckets. Assuming subject matter jurisdiction, the plaintiffs who rode with the experts who were excluded, if you affirm the  order, for those plaintiffs, yes, summary judgment was proper. I represent the water front, so I concede it for those plaintiffs who I represent. For the plaintiffs who filed after the court, I represent them. The plaintiffs who filed      They had a right to submit their own experts. I represent many of these plaintiffs, and I would have submitted new experts. I would  have submitted                         a review of this case. I'm going to  a little bit more detail than most of you   do.          a lot of people. I'm going    to            cancer researcher, you can't weigh in on active comparator being superior. All of those different things that experts have to be trained in science. To hit a final point, you're not supposed to stray beyond what the study authors found. These are cohort studies. Almost everything we're looking at here are not scientists conducting a Bradford Hill analysis. Of course they're not going to weigh in on causation in an effective  They're          It's  going to      more effective  a medical study. It's   going to go let me apologize I don't want to try to pretext to address the preemption issues. I want to focus first on the one that entails negligent storage and transportation expiration dates and packaging against the generic manufacturers. Let me start with what I think is a very simple example that highlights the nature of the district court's error. I'm from Florida and I think the three of you live in Florida. The common law is going to impose on us the duty to behave as a reasonably prudent motorist would. Don't text and drive. Obey the speed limit. Come to a full stop at stop signs. Have your daylights running. If Congress passed a law to save energy and said you can't have your daylights running, that theory of breach would be preempted. If I hit somebody with my car and they sue me for texting while driving, that theory is not preempted.   law doesn't have a discrete cause of  saying don't check your Instagram account while driving. That level of generality doesn't make any difference. And it doesn't matter whether you call the obligation not to text while driving a theory of breach or any other domenclature. The bottom line is of course there would be no preemption there. It doesn't matter also that you couldn't drive completely safely because under Florida law you're supposed to have your daylights on. Those principles control the expiration date, storage and  and packaging claims. It is undisputed that under Florida    to make the product safer. Undisputed. One of the things the district court said in one of its preemption orders and I'm not sure it cuts across the three alleged deficiencies you mentioned but at least some of them was that if you allow these types of products to        not the only reason she provided but that's one of the things that was in one of the preemption orders, right? It is. That was the misbranding theory which admittedly our bigger theory it would have more repercussions. That's why I started with this narrower theory which is not where I think the district court made that observation. What the district court said with respect to these three theories is because you couldn't make the product completely safe because expiration dates alone wouldn't have eliminated the NDMA therefore you didn't have to take any action required by state law. That's just patently wrong as a matter of common sense. It also flouts your precedent. They are the ones that like to point to  Mink is on all fours for us on this particular point. Mink involved one negligence claim with three theories of breach. One theory this court found was incompatible with Florida law. One theory this court found was preempted and one theory this court said could proceed. You didn't get rid of the entire negligence cause of action because of the preemption of one theory of  You said the plaintiff gets to go forward with the theory of  that is compatible with federal law. You said the same thing with respect to a statute. We are asking you to take a blue pencil and rewrite state law. There are two responses to that. First, that is an eerie guess that involves severability analysis. Would the state Supreme Court still want its negligence regime to apply to expiration dates or packaging even though it can't apply to the composition of the molecule? They didn't win on an eerie guess. They won only on preemption. In your view, that is the next step in the analysis. It is. Let me tackle it right now head-on. I am fine saying you should take a blue pencil to state law. You do not draw an X. That is not how we do preemption. We do preemption as applied. Outside the situation where the state has a severability clause, we want our entire legal regime to go down. The normal way you do things is as applied. As applied challenge is a blue pencil. You are taking state law and saying we will get rid of only the portions that conflict with federal law if there is a conflict and we leave in place the rest. In addition to your precedent saying these theories have to be allowed to proceed, common sense and the way you normally deal with as applied challenges said these theories have to proceed. Let me make sure I understand what you just said. You think we have to dive into the substance of state law to do the preemption analysis? No, I do not. I was willing to embrace the proposition my friends on the other     accommodate or accept your theory as a merits decision that assumes your claim is not preempted and fails on the merits for other reasons. As you put it with an eerie guess about a certain state's law. That is correct. You have enough to tackle with these consolidated appeals. It is commonplace for this court and every court when doing a preemption analysis to use the blue pencil. Let me tackle the bigger theory you referenced before. This has wider application and applies to all groups of defendants. The basic principle is that preemption is about conflict of law. If there is no conflict between federal law and state law, both sovereign laws are given full effect. I have never seen the Supreme Court say we are leaving a question open and have it say we already answered it in the case we did.   leaving open the question of whether consolidated cases through trial involve the same principles we applied for this plaintiff. They didn't say we already decided it in Galboin. This question is open to you. I think my friends on the Supreme Court have said we  decide it based on first principles. What does federal law say? Federal law defines misbranding as a drug dangerous to health when used in the dose manner. That's a congressional definition. It then says if a drug is misbranded everyone in the stream of commerce doesn't matter who you cannot introduce it into commerce. You must stop selling a misbranded drug. That was not the duty imposed by federal law in  Bartlett. The duty imposed by federal law was don't change the label. The duty imposed here is don't sell it. That's the exact same duty imposed by state law. State law says if a drug has a terrible risk utility profile, nobody should take this drug because it's an antacid drug that causes cancer, then you shouldn't sell it. Federal law says stop selling. State law says stop selling. We allege that renitidine breaks down into NDMA which is a dangerous     drug. The FDA says it's dangerous to health and if you don't voluntarily pull it off the market, we're going to bring enforcement actions against you. That's the  same   by  the  I don't see plaintiffs rushing to the courthouses to allege that drugs are misbranded in the future. They're going to spend a lot of time, energy, and money going through discovery only to lose at summary judgment. Plaintiffs don't like to do that. The fact that we might be able to get through one phase of proceedings that's not a reason for you to distort the supremacy clause. That's not a reason for you to misread the statutory regime. There's a third theory of recovery that I do want to mention. It's a failure to warn through the FDA claim. This is a relatively unusual theory that a few states have adopted that say you can satisfy your duty to warn the end consumer sometimes through an intermediary like the Food and  Administration claim. It's a  warn through   California recognizes that theory.  recognizes that theory. I'm not asking you to do 48 other eerie guesses, but the viability of that theory is sound. There's no conflict with  law. Federal law doesn't say you're not allowed to tell the FDA information about the dangerous properties of the drug. The only real argument to the contrary is so-called Buckman preemption. It's more object and purposes preemption similar to a case like Geyer. Nobody on the plaintiff side is asking to enforce the drug and cosmetic act. We're not saying you go down because you didn't comply with FDA regulations. We're saying you lose because of state duties. It's state law that imposes this duty on you and federal law doesn't prevent you from doing that. If that is the correct way to cognize these issues, there's no conflict between the state and  regimes. So these theories can stay. Explain to me the actual misbranding theories. What do you claim was misbranded? We claim the drug was misbranded because it had a  carcinogen in it. That could not be cured by just adding a warning to the label. When you have an antacid drug that causes cancer, that drug needs to be pulled from the market. It had nothing to do with the expiration or the time it was in the container. Not the misbranding theory. That's a different theory. I just wanted to understand that. Thank you. Thank you, your honors. Thank you. Mr. Guggerty. Good morning, your honor.  I want to start with Mr. Keller's theory on the storage and transport expiration date and package elements. What Mr. Keller has said is  central flaw  argument he did not address. The plaintiffs have alleged from the beginning that it is carcinogenic from day one. That's baked into every one of their claims. Importantly, Mr. Keller conceded that every single claim is based on one of two things. For the expiration date, it's a state law failure to  For the remaining, it's a state law duty of ordinary care. I think that is fundamentally dispositive here. When you look at what it would take to satisfy those state law duties, which is exactly what Judge Rosenberg did, in order to satisfy those  based on their allegation of an inherent defective molecule that always degrades to form MDMA, the generic manufacturers would have needed to issue a warning. In order to satisfy the state law duty of care, MDMA was not the generic manufacturer that was going to do that. It was intended to               do this to  intended purpose.   intended  do this to the intended purpose. I'm just trying to understand where the dividing line is. If you have that sort of a claim, no one takes issue with the label, no one takes issue with anything else, but the drug is going to turn into something else if you store it at higher temperature levels. And the allegation is that they did. So when people took it, it harmed them. That claim would not be preempted by the food drug act, right? I think if the allegation was that it was solely the temperature violation, that might be a bit of a misunderstanding      levels here. I want to start from that basic understanding, and I want to make sure that understanding is right or absolutely wrong. In that hypothetical, which is not this case, why in the world would that simple claim be preempted? I mean, the preemption analysis is the claim something that federal law bars, that we couldn't do it. So in that particular instance, I think the duty of sameness would not prevent us from storing it differently. And we have not argued that the federal duty of  would prevent us from storing it differently.      one-way shape or form. You have a million other obstacles before you get to a jury, but it wouldn't be preempted at step one. Not under the possibility preemption,   I'm not limiting your answer.  Buckman, there might be a concern. If the concern is if the hypothetically put it at temperature, but the specific temperature threshold or storage conditions as the plaintiffs pleaded, there's a specific federal regulation. But in this scenario, it was outside what the recommended temperature was. That's the whole point. That's why it's negligent storage. Right. I agree,  that in that situation. That wouldn't be a Buckman preemption. In essence, what the state law claim is, the federal law sets that standard. Your Honor did not say that, but I'm saying if federal law were to set the standard and they have gone to  regulations for the storage standards and their pleadings here, and the claim is that the state law attempts to enforce that, that's where the Buckman issue comes in, because 337A says that is exclusively the role of the FDA to enforce FDA regulations. So there would be that Buckman conflict preemption issue there, which is distinct from impossibility. The reason I want to return to this case is that looking at these claims and what was alleged here with that fundamental safety issue is that in every case they're alleging that was inherently dangerous or  Judge Rosenberg used that language of a ticking time bomb. She also asked them about the nature of their state law claims. It wasn't a narrow one like your Honor's hypothetical. It wasn't a limited duty to take that step. It was the general duty of ordinary care to render, and that is different than warning,  potentially the duty of  care could be met through a warning or possibly a design change and then there would be the option of stop selling. It's clear those are all preempted actions. Mr. Keller conceded that the law of no state would be fully satisfied by just shortening expiration dates. It's the same principle for all of their claims. They haven't alleged that there is a claim like that which your Honor has advanced that there would be a state law duty of that kind. It's all ordinary care. Why does that matter in the  analysis? That may not matter a lot on the merits. Why does it matter on preemption? They looked at the duty of  the federal law, but they spent just as much time on looking at what the state law duty is because the analysis requires looking at what the generic duty is and does the state law duty fall into one of would it require conduct that is barred. What if you're trying to assert a claim that  state tort law and there's no precedent? How do you do the preemption analysis if you have no state law to look at? You have fillers and general principles, but the plaintiffs are trying to extend and they tell you from the beginning, state tort law stops here so far, but we want to take it here. How do you do the preemption analysis under your scenario? I don't think that's what they're doing here. These questions are meant to help me try to understand how to preempt    If that were the theory, how do I decide preemption by looking at state law that doesn't currently exist? I think your Honor that the principle that I would take you to is from the decision that courts should not strain to reconcile federal and state law that are in conflict. In that hypothetical, your Honor, is presupposing an attempt to invent a new state law that would not be in conflict. You say invent. They would say in my hypothetical extend. Either way, they're trying to take tort law one step further than where it currently exists. I think that's not what they're doing because they're trying to break existing state law into sub  That's what Mr. Keller said a minute ago. They're trying to parse it into these fine duties and say you can blue pencil it down to just whatever fine duty it is. They're   it down into some finer thing that could potentially not strictly be barred by the  I have to rewrite their legal theory to do preemption? No, that's not    They're      taking their legal theory at face value and accepting it. What their legal theory is, their legal theory is it's an ordinary state law cause of  It's one that can be parsed down and broken down, blue pencil down. That's not how the cases have decided to go. I want to turn briefly to their other point on the misbranding theory. I think Mr. Keller said no court of appeals has addressed this. It did not reach the issue of what the meaning is of Bartlett footnote 4 because it decided it didn't need to when the plaintiffs have pleaded as judge Rosenberg explained in detail below, they have pleaded claims that are fundamentally failure to warn, design defect, every court to address those has held that they are preempted by federal law. I think in terms of the argument Mr. Keller made about who cares, why does any of that matter, the Supreme Court considered this. In that same opinion that Mr. Keller drew from, that was mensing. There was a parallel misbranding argument briefed in  The Supreme  still held that preemption applied in the face of that opinion. Your Honor, if I may before I stop, I want to address two other brief basic  Judge Rosenberg did ultimately extend her ruling based on 702 and the show cost process to all generic cases except those 18 generic only. I want to emphasize that process to answer Judge Legola's  earlier, we need to look at what the parties and the district court did and how they treated these cases, did they treat them as merged or not? In the 4595 order that the plaintiffs appointed to as dispositive, that was the order that issued a separate judgment for the 18 generic only cases. The court did treat those 18 cases as distinct. It reinforces that, as Mr. Petronelli said, from the  beginning, the court has treated these cases as distinct. The court referenced the second amended master complaint. The master complaints were not intended to consolidate for any purpose the separate claims of the individual plaintiff. I think that the court showed pause. Forgive me,  honor. I was just saying the last point I want to make is that I think the court's treatment when it decided to move forward was in agreement  the   The decision not to issue a motion to  occurred after the Dalbert ruling had come down. The district court didn't say it wasn't going to enter judgment because it didn't treat it as merged. It just said this needs to be an orderly process. There's 14,000 plaintiffs that I have to sort out here. It did implement that process. It did give each individual plaintiff due process and rights. It invited briefing and invited plaintiffs.  It said come forth and the plaintiffs can bring forth new evidence that that was referenced in there. Plaintiffs dispute that whether that was a possibility. This is your chance to come forward or at  proffer. That was all there. I know I'm well over time. Thank you very much. Thank you. Mr. Hudson. May it please the court for retailers and  first thing I'd like to clarify for the court, I know there are a lot of moving pieces here, is that the only preemption theory is the parallel misbranding theory. Much of the conversation I had earlier with my friend about the  personal injury complaint, that's irrelevant. On the parallel misbranding theory, I would like to start, this is extremely important, to my friend on the other side, Mr. Keller, at the very end of his career,   misbranding is dangerous because it contains a carcinogen and, quote, that could not be cured by a warning. That second piece is critical. And the reason that that's important is the plaintiffs simply did not present that theory in their pleadings, in their opposition to the motion dismissed below or in their opening briefs to this court. Indeed, their pleadings are directly contrary to that notion. Again, we're talking here, the relevant document is the original master personal injury complaint, 887, paragraph 485, this is in the    486, quote, at the time renitidine containing products left defendants control, there was a practical and safer alternative design that reasonably anticipated or intended function. For example, defendants could have  proper information and associated information. The theory throughout was defendants should have adequately warned of the danger of renitidine. That was the  And for good reason, because every state, virtually every state, as the  Court recognized in  adopted section 402A of the second restatement of the  defect claims. That's why the plaintiffs played the case the way they did. And that's also why judge Rosenberg in granting the motion to dismiss said plaintiff theory would render all meaningless. Every plaintiff in a drug case can say the drug is dangerous. If all you have to show is the drug is  because after all that's what 352J says.  doesn't say anything about cannot be made safe. Judge Rosenberg said, if that's all you have to do, that would render all case              not            certainly did that here. One of the arguments is that your theory of misbranding has sort of shifted or changed. That it was based on an insufficient or inadequate warning. And now it has morphed into VANTAC itself to use the brand name was dangerous because it had which could turn into MDMA. I think that's fair. Theories do shift between amended complaints. You look at the operative complaint when she found our claims preempted. We learned from           The argument was much broader than that.  was that you've  from where you ended at the district court to here. I disagree with that. We argued it fits the definition of misbranding. That was always the theory we pursued in front of the district court. I don't think we've adjusted our position. The factual allegations changed. There's nothing wrong with saying a drug is dangerous and shouldn't be sold at all. But you could have made it safer by adding a better warning,  expiration dates, storing and transporting it in cooler conditions. My friends on the other side seem to really want to focus on things that I know you recognize as an appellate court. They're focusing on what the Supreme Court didn't quote. And then they're focusing on a petition for re-hearing after the Supreme Court issued the decision. When the Supreme Court rejects a petition for re-hearing after a  is issued, they issue a one-word order denied. They didn't consider anything. So that obviously is not something you can take as controlling the definition of federal law. It's beyond a stretch. You wouldn't do it in this court of appeals after someone issued a one-word order denied. That's not something you can rely on as precedent. Let's remember what happened     district court entered rule 54B certification and a bunch of people were up here on appeal for 20 months. They weren't participating in the district court proceeding because they were in the appellate court. The district court issued an indicative ruling and said send these cases back to me so I can enter summary judgment against these people who lost on the pleadings. Of course you can't apply the order to us. The district court said yes I can. Going back to the merger issue, I think that is once again  that the district court wanted to mash everybody together. I have never heard of a situation where appellants on appeal are charged with activity while their cases are disassociated from the district court. I'm happy to yield back time if you don't have any questions. Thank you very much. We will take a five minute break and come back for the last set of  Mr. Snido. Good morning your honors. JJ Snido on behalf of the Adams class action plaintiffs. Just to get us out of the way up front, I think the court will be delighted to hear we do not have a jurisdiction issue with this particular appeal. The reason tying off what my colleagues spoke about is it is abundantly clear what the operative complaints are. That's the medical monitoring class action and the second amended economic class action complaint. For that reason we don't raise a jurisdiction issue. Again, just to you represent who? The Adams class action plaintiffs. The medical monitoring and the economic loss class. And the  loss plaintiffs were dismissed on standing but it was really based on the Daubert order. Let me get into that a little more. I think at the root of this appeal are three errors. The first is exactly what you identified. The district court decided that because she daubered out experts in the personal injury cases that  there was a reason for                        medical monitoring. What does the complaint rely on for that? To shortcut this, we can see in the brief that the medical monitoring appeal is tied up with  In other words, if you reverse the Daubert order, we think the answer is exactly   district court recommended.  if you macro it into the paralegal organization plan, they may send the hallway down from the city to the county . I would      said we would put forward economic experts in order to testify as to the market value of Zantac. The district court agreed with us in the motion to dismiss posture that we had article 3 standing based on basic principles. Economic injury is concrete for article 3. Then one thing happened. That one thing is that the district court dogged out the personal injury experts. Based on that, the  district   have standing after that. With respect to judge Rosenberg,  doesn't follow at all. The class action is different from the  injury claims.  intended to  a different set of  conditions.          it again, not doctor experts. Did she analyze the economic experts? We didn't get that far. She just dismissed you really omni causation experts. Yes, I agree with that. There was a short procedural history. She initially issued the order. We moved to stay class proceedings because to the extent that the medical experts were allowed to  our economic experts relied on them but we didn't do them as necessary. The district court asked us to show cause as to why for the same reasons that she granted summary judgment in the personal injury cases, why that didn't mean that we no longer had article three standing. We responded to that in the same   don't think that the order has impact on our standing and we told the district court that we did intend to present evidence of a couple of different types. We told the district court that we intended to present evidence from our plaintiffs in the manner of depositions of them testifying that they wouldn't have purchased ANTAC. And critically on page 12 we told the district court that we intended to present experts on the perceived safety of ANTAC and the economic value of ANTAC and evidence from the defendants as well. Can you help me understand just practically would the and I know you didn't present them because you didn't get to that point but help me understand what generally speaking the experts on the economic value or lack thereof of ANTAC would have based their opinions on. They would have had to have said there was I shouldn't assume. My gut feeling is they would have had to say that because there is something wrong or at least potentially wrong with ANTAC it wasn't worth the price that was paid for it, right? Or am I just completely off? So I'll answer the court's question. Let me say I think the plaintiffs would have  purchased ANTAC had they known there was NDMA. Which means at some level you claim,  will try to prove that ANTAC was defective in some way, shape or form because it had that ingredient or something that would turn into that ingredient. But you had the FDA recall. All of that, the only thing I'm trying to avoid saying is that it would be necessary for the economists to have proof that for example ANTAC causes cancer. I don't think that's true. I'll point out a couple of things.  the economists would have had to point to something objective that would have reduced the value of ANTAC. Absolutely. We don't have a record on this of course. I'll make a representation as an officer of  They would have pointed out that in a market that has all kinds of alternatives consumers would be willing to pay less for a   example ANTAC has MDMA. Even the defendants agree that that is a feature of that drug. I'll put a few cases on the record that are directly on point. There was no even allegation in that complaint that any of the plaintiffs had suffered any harm or that the substance didn't function as expected. The court said of course allegations of economic harm are enough. You can have a product recalled and people bring claims based on the  damages that they suffered as a result of the recall or the defective product.   cases in our brief in exactly the same procedural posture. I've given you one. I'll cite that one where it is out of  There were dietary supplements. No allegation that the plaintiff was harmed by the dietary supplements. The class action was allowed to go forward based on economic loss. You said there were three reasons the district court made a mistake. Tell me what the third reason is. I think you stopped me after one. The district court made holdings about what a reasonable jury could decide without seeing any of the evidence a reasonable jury would see. I'll direct the court to footnote 14 of the order actually entering judgment against the class plaintiff. There the district court says no reasonable jury could find that Zantac had zero value. There's no evidence to support that.  are allowed to believe expert testimony. Our experts would have  that Zantac had zero value. This is a friendly question. A jury wouldn't have had to believe that Zantac had zero value.   might have thought given the possibility of MDMA and other products on  it was worth a dollar and you would still be able to  something. Thank you very much. You've saved your time for  the next  I'm   Alana Eisenstein. I want to start where you left off, which is whether or  plaintiffs could have proven there was a price premium rather than zero value or to take various examples of theoretical claims that they could have stated but didn't in this case. This is not your typical economic loss class action case that you see in other contexts which did not involve an over the counter prescription medication subject to section 379 express preemption and many other cases which involve cosmetics or other cosmetic products. The plaintiffs narrowed their claims to one there were three key aspects.  that the FDA approved label failed to disclose cancer risk due to dangerous NDMA rendering it misbranded and illegal to sell as worthless one word zero value. There were very good reasons why plaintiffs pursued those very narrow theories. Cancer risk misbranded due to the label and worthless. Those were the key components you can see it in the district court summary judgment opinion and she relied on plaintiffs own arguments. They argued this is a reasonable theory that because of the FDA recall Zantac was not worth the price at which it was sold and this class of plaintiffs paid more than they would have paid for that product. Why does that claim fail at the summary judgment stage if the order doesn't have an effect on it? The recall was a voluntary recall. It was based on an FDA missive. That's correct. That was due to the risk of potential presence of NDMA that could have exceeded levels. A lot of people don't want to take risks. Why is that claim   ruled out based on the Dalbert rulings? The Dalbert rulings were two plaintiffs' actual pleadings. Again,  hitched their claim to the cancer causing dangerousness. I thought the economic loss plaintiffs when they  were seeking a reimbursement but why?  decision highlights the specificity of why this holds plaintiffs not only to a  claim but a specific theory of why that product is worthless. Here, plaintiffs articulated their theory of liability not just a broad claim of liability that this court should examine the theory of liability and the pleadings that underlie it.  we're at summary judgment so you can go one step further which is the evidence that was in the record as well. That includes the expert opinion  the plaintiffs  not plead for example that it was defective in design is because by federal law for two reasons the defendants could not have  the design by changing the formulation first. That's why   had to narrow their theory of why was Zantac worth less. Zero value. The reason they said it was worthless couldn't be because it was defective in design because the branded manufacturers could not have changed the design under federal law.  they couldn't have argued even if the label was deficient because under 379R it would be preempted. 379R prohibits economic loss class actions under state law that  are    I think Zantac was worthless because of the risk attributable to MDMA. I want to get my money back for the Zantac I paid. Why is that not a viable theory? The subjective perception of a plaintiff that bought Zantac got the benefit of their bargain. They were asking for their money back so they say no. They took it and it was effective. You're assuming that too. I'm not  taking it because of the FDA recall. I think you can go back to the DeBernardis decision. There was an adulterant in a supplement that rendered the product illegal to sell. The court made clear that the issue there was not just the subjective perception of the  It was the objective of the record. It was the    The court said it was not the objective of the record. The court said     it         if no one knew anything about the formation of NDMA it was discovered the day that the FDA discovered it the products were recalled at that moment. And there was no bad conduct of any kind by any defendant. That doesn't entitle plaintiffs to recover in that instance. They have to point to But that's a very different merits decision than the one that was rendered here. Let me go back to the summary judgment order here was not based on that.  based on the claims as pleaded. Tell me the reason why you think the district court granted summary judgment on the economic loss class. Because the  hinged their own case. I didn't plead the case for the   the court comes up with theoretical I am asking you what the district court gave its reason says. Plaintiffs did not plead that they were unsafe for reasons other than cancer causation. You don't have to prove that. You have to prove a risk can render a product less than it was sold for. But they haven't proven a risk of cancer causation. Why was it taken off the market? The reason it was taken off the market was business reasons. Let's make it easier. I will try to  in the next couple of minutes to explain why it was taken off the market. I will explain why it was taken off the market. I will explain     why it was taken    I  explain why  was taken off the will explain why it  taken I will explain why                market. I       will I  explain why it was off the market. I  explain the market. I  explain why it